Good morning, Your Honors. Keith Wesley for the Plaintiff and Appellant and Cross Appellee Memory Lane, Inc. I'm here with my colleague, Corbin Barthold, and I would ask with the Court's indulgence to reserve five minutes for rebuttal. As much as you want. Thank you, Your Honor. And may it please the Court, this appeal boils down to a single overarching issue. Did the Plaintiff, Memory Lane, get a full and fair trial on his trademark infringement claim? We would respectfully submit that the answer to that question is no. Memory Lane had to try this case both a. without the best evidence of trademark infringement and b. in the face of irrelevant, highly prejudicial character attacks against its founder. And yet, even with both hands tied behind its back, we nearly won. So, more specifically, there are two primary reasons why this Court should conclude a new trial as necessary. Primary reason number one, Memory Lane was denied repeatedly the opportunity to show the jury the best evidence of a likelihood of consumer confusion. That was dozens of correspondents from consumers who clearly thought that Memory Lane was the same as or affiliated with. Well, the jury knew about that information, didn't they? The jury knew about... Misdirected email, or misdirected information. What the jury was allowed to hear, Your Honor, was the number of misdirected communications and a general description. And the vehicle for that evidence was our founder, Mr. Cohen. And the reason why that is significant, Your Honor, and the reason why the protocol that the District Court set up is both unprecedented and inadequate is several reasons, frankly. First, it's precisely the content of the communications that proves that consumers were confused. If the defendants had stipulated that the plaintiff had received two dozen misdirected communications from confused consumers, then we might be okay. Then everybody would be in agreement that they were confused consumers and the jury is told the number. They don't have to read the actual content. What is it... Give me an example of an email. What is there in the content that would show anything other than that it was misdirected? Your Honor, I'll point you to page 15 of our opening brief. Here's an example. This is an actual email received by my client, Memory Lane. I quote, I'm having a problem with my classmate's account and I believe this is part of this company. Who can help me with my issue? The Memory Lane website does not have a way to contact you. Please send me a reply with a way to ask about my problem. So what that shows, Your Honor... They thought that Memory Lane could do this. You know, I don't understand how that shows more confusion than just the entry that there was of email sent to the wrong company. Well, what it does, Your Honor, is we get inside the head of the consumer. We know that this consumer is specifically saying, I believe that Memory Lane is part of Classmates. That's classic trademark... They thought that's the reasonable inference when they misdirect their email, isn't it? I disagree, Your Honor, and the reason why it was so prejudicial was because the defendant put an expert on the stand, his name was Jeffrey Andrian, and he said, I read these emails, the jury. These don't indicate any confusion. These were just mistakes. And so we have an expert witness. Well, we have an expert witness who's telling the jury, and as the court knows, expert witnesses oftentimes have a veil of more knowledge, more believability than the average witness, and he's telling the jury flat out, these emails don't say what the plaintiff's founder is saying. And the problem on top of that was that our founder was the subject of savage attacks on his parents. So when the expert was on the stand, were you allowed to cross-examine him? I was allowed to cross-examine him, Your Honor, and the first thing I asked the district court to do was, can I show the expert these emails that he just characterized? They were literally sitting right behind him on a cart in my exhibit books. The expert gets on the stand, he says, these emails aren't, these aren't showing confusion. These are just mistakes. It's like when you go in the phone book and you're going down the list and you see Judge Miles. I think the question is, what did you do beyond that to say? I asked, Your Honor, now can I show this witness these emails? I want to show the witness and show the jury what they actually say, and then we can find out whether or not his characterization Let me ask you this, counsel. You had a witness. You had an expert witness, right? I did. And your expert witness took the stand and said, I read the emails. They showed actual confusion, right? Correct? And I'm assuming that you had a chance to have him explain like what did you use to form the basis of your opinion and laid it all out to the jury. Well, my expert was assuming the fact that there was actual confusion. He wasn't characterizing the emails themselves. He said, assuming that there was this spate of misdirected communications and assuming that you find that this was actually actual confusion, then I find that the plaintiff memory lane has been harmed. Their expert went a step further. He said, I reviewed these emails. They don't show confusion at all. And so in the face of that, I think under just basic rules of evidence, basic cross-examination, I should have been able to get into what the emails, what the other correspondents that the expert was characterizing, what they actually said. And this, Your Honor, wasn't there some instances in the cross-examination where he handed the defendant's expert an email and he testified about it? No, Your Honor. No instances at all where none of the content of those emails got in? No, the emails did not get in, Your Honor. I tried, I'd say on three or four occasions. I tried before trial. Okay, the actual marked exhibit may not have gotten in, but wasn't there testimony where the text was read in a part of those emails? No, Your Honor, the text was not read in. The district court made a clear distinction. She said before trial, and she stuck with this ruling throughout the trial, even after their expert testified. She said the best you can do, plaintiff, is testify about the number of communications and the general description of them, so that it was somebody from classmates coming to our website and they were confused. That was the best we could do. Okay? You were not allowed, for example, to ask, Mr. Adrian, is that his name? Andrean. Andrean. Mr. Andrean, what is there about the email from such and such a person of this date that indicates there is no confusion when they misdirected it? Well, Your Honor. Were you able to ask that? I don't know if I was able to ask that, frankly, Your Honor. Did you ask it? I think that would have been a terrible cross-examination question. That's not the question that Judge Murphy asked you. Did you ask that kind of question? No, because it wasn't my practice, and I don't think it would have been effective cross-examination to engage in deposition questions and open-ended questions that would have allowed him to then expound upon emails that I wasn't involved in. Well, that's usually how you undermine an expert's testimony. That's how you get doors opened. Well, I think having him characterize the emails themselves fully opened the door, and I should have been allowed to show him the actual documents. What was the great fear? Let me ask you this. I think I agree with you that the doors were open, and I think you ought to be able to cross-examine somebody about confusion and about specific documents. But what I'm bothered by is that I don't see how any particular email you point out to me, even the one you quoted, shows more confusion than a misdirected inquiry. That's what I'm looking for. What is there in those documents that you were prohibited from using that shows, either in quality or quantity, confusion different than misdirected email? Your Honor, I'll try again with another example. We have dozens of them in the record, but, quote, since the merger with classmates.com, I have not been able to sign into the site. My dues are day up for a year. That was a merger. That's just showing that I misdirected this because I think there's a relationship between classmates and memory lane. How is that any different than that? That goes to the heart of the matter. Their whole premise in this case was saying that everyone gets misdirected communications. Our client is named United Online. We get communications from United Airlines. It doesn't matter. It's just mistakes. It happens every day. Read their closing argument. This was the centerpiece of their case, and the centerpiece of my case was no. But my question is this. What does that email tell you other than there's a belief by the sender that there's a relationship between classmates and memory lane, or that they're one and the same, and if I speak to memory lane, I'm speaking to classmates? What more does the content show than that? That's exactly what the content shows, and that's exactly what is at the heart of it. So it shows no more than misdirected mail? Well, according to their expert, you can have misdirected mail for a variety of reasons. It doesn't be... Listen, I'm not challenged. I think misdirected mail is confusion. Right. I think it's confusion, but how is the content showing a different or a greater confusion than just the misdirected mail? Well, Your Honor, I'd point to a whole line of trademark cases. There's the Reardon case out of the Ninth Circuit. There's a series of other cases we cited in our brief where this type of evidence, the actual communications, is admitted into evidence as a matter of course. I'm struggling with the same thing that Judge Murphy's trying to get at. I don't know what argument you could have made that you didn't get the opportunity to make by the exclusion of the actual contents of the email. So the significance of the misdirected communication, the fact that there were some emails from customers who contacted Memory Lane, that fact was in evidence, ample evidence. Both experts testified to it. So whatever arguments you had in closing or in cross that you wanted to make, you weren't precluded from doing that, right? Because the district court acknowledged and recognized that the email was not irrelevant, and there was testimony as to that fact. So you have the existence of the misdirected emails, however many number there is, and you could have crafted your case based on that, right? And if they had stipulated that there were 40 emails, and those 40 emails showed exactly what Judge Murphy is saying, those were 40 consumers who believed that my client was the same as or affiliated with their client, I would agree with the court. That's not what they did. What they did was say, all of this, it doesn't show any source confusion at all. It's not confusion that in any way can create a trademark infringement claim. And so... So in your closing argument to the jury, did you argue that these were misdirected emails? You had an instruction from the judge that, on the sleek craft factors, correct? Absolutely. But what I was relying upon was the secondhand characterization of my client's founder, somebody who was savaged by them on cross-examination. And I just... Well, but there seemed to be no dispute about these misdirected emails, that they existed and whatnot. That they existed. You just wanted to get in the content. And, you know, when I looked at what the district court judge did, it looked like she was, and she didn't put it in these words, but, you know, some of the content of some of these emails does not put classmates in a very good light. But that's not what... And she was, I think she was concerned that this is just, you know, this is just really, some of this content is just irrelevant to the notion of confusion under the trademark law. But, Your Honor, it sounds like you're reading into a 403 issue in the end of the... Well, as I said, the district court didn't say 403, but it looks like she had some concerns with the content. I think I'm at five minutes, so if the court... You can save it if you'd like. That's fine. Good morning. May it please the court. I'm Craig Folkler, representing the defendants of FLE's cross appellants, memory... Keep your voice up, please. I'm sorry. Classmates and Unite Online. I'd like to start off with just some clarification about the testimony and what occurred during the examination of our expert, Jeff Andrian. Mr. Andrian's testimony was that he disagreed with their experts, Mr. Stewart's testimony, that the emails and the messages showed confusion. But he didn't say because of the content. He said because there wasn't enough information in the content. And I believe that what the emails indicated that... All the emails indicated was that at the time they were sent, the sender thought they were sending them to classmates or the Unite Online company. That was clear by the composition and the content of the emails. This is undisputed. And quite a bit of the content actually got out, as we mentioned in our brief. Those emails were primarily out of the 40. The vast majority were complaints about billing. I didn't get my yearbook. I'm canceling my membership. They didn't know who they were talking to. They were confused. They were mistaken as to who they were contacting. But the type of confusion, we believe it's important here, Your Honor, and I understand your point, I believe, is whether or not somebody's information about who the two parties are, what... I'm sorry. Go ahead. Confusion is as to source of origin. Correct. I agree. And the source of origin is you have to understand what the businesses or the products of the two parties are. Now, in this case, it's clear that when individuals found out what the two businesses were, let's start with the classmates, people sending these messages, making the phone calls. When they found out who Memory Lane was, the plaintiff, they weren't confused. They weren't confused as to source. That was recognized by Memory Lane itself. When they started getting the phone calls, the way they handled it was when they got a call and they realized it was by a classmate's customer looking for classmates, they told them, we're a baseball card company. And they did that because that cleared up. Then the person knew it was... they contacted the wrong person. They had two consumer witnesses at trial, just two. Mr. Burcham was the first one. He was a classmate's customer. He contacted them. And when he was told that they were a baseball card company, he knew he had the wrong person. Mr. Merkel, he was a regular, and for a long time as a matter of fact, classmate's customer. He contacted... when he... he was looking for them. He was in a hotel, went on a computer that he wasn't used to, went online, and he hit the entry for the classmate's nostalgia content site that said Memory Lane. The minute he saw it, he knew that that was not the company he was looking for. So there was no confusion as to source. There were mistakes made, and maybe they were confused by the two names that they thought they were sending to the other party. But once they learned who the two parties were, then they knew... there was no confusion. And that's really what likelihood of confusion is about. You have to know what the two... you have to be aware of the plaintiff. Nobody was aware of the plaintiff. They had 2,000 to 3,000 customers. And once they learned, as the plaintiff knew, that they were a baseball card company, there wasn't going to be any... they weren't going to think they were connected. They weren't looking for sports memorabilia. No, no. And when they heard it was sports memorabilia, they knew it wasn't who they wanted. So they didn't think there was a connection once they knew... once they knew the facts about who the two were. And companies do get phone calls from... you know, there was testimony that people see a name, they think it's the same one, they make a mistake and they call. The matter of fact, we believe the plaintiff's position that, you know, there was likelihood of confusion was really pretty unreasonable based upon another admission, in addition to the one that all they had to do was tell somebody they were a baseball card company and it cleared up any confusion, or avoided confusion really, was that when they went into business, there was already... when Plaintiff Memory Lane went into the sports collectible card business, there was a short distance away, here in California, another business called Memory Lane in Manhattan Beach, that was in the same business. And during their deposition, Mr. Cohen, founder, leader of Memory Lane, he said, well, that's not a problem. I didn't think that was a problem. How can you think that that's not a problem? Yet, somebody who's got a nostalgia content site, which isn't selling collectibles, is doing two facts, the fact that he didn't think that was a problem, the fact that also... Well, the problem you're getting into is that you're trying this lawsuit, Memory Lane and Classmates. We're not trying a lawsuit. We want to relive everything from years gone by with two outfits and close to each other in California regarding, it's called Memory Lane. We don't know how many instances of misdirected mail there was, which is very irritating. We don't know anything about that. So I don't see how you can compare the two. It is true that it goes to the strength of the mark if it's used by many. But as to comparing instances, I just don't see where that helps you. Well, I'll come back to it later because I think it relates to what we'll see. Well, it relates to the strength of the mark, clearly. It also relates, I think, when you put it all together, to whether or not the plaintiffs really had a reasonable belief for a lot of the things they did in this case, which I'll be discussing. I think it just shows, I hate to use the word hold up, but it was a hold up. They were hoping a jury would hit on something, and they didn't really believe there was a problem. Let me ask you a question. Let's assume for a moment that it was the error for the District Court not to allow these emails to be admitted into evidence. Let's just assume that, okay? That it was, Your Honor? That it was error. Okay. That it was error. Okay. So even if there's error, it has to be harmful error. Absolutely. Right? So why wasn't this harmful? I mean, evidence of confusion is probably the most I'm not saying it is. No, no. I think the actual confusion- Probably is the best of the factors. Is said to be given heavy weight. Yes. Most weight, maybe. Yeah. Right. And sometimes strength of the mark can be critically important. Agreed. But so why would this be harmful? Exclusion of these. Why should they have been excluded? No. Why isn't it harmful? Why prejudicial? Why wasn't it? Prejudicial to the other side having been excluded? Yes. Yes. Because, Your Honor, actually, they were really told the content. They were told that they were requests to cancel. They were told that they were requests to the bill. They were billed improperly, that they didn't get their yearbook. And if you look at- And who presented, who testified to these matters? Mr. Cohn? Yes. Yes, Your Honor. And, as a matter of fact, I believe that a few of the e-mails or messages- he also testified about a subpoena being sent to- I'm sorry? And a subpoena being sent, I think it was from the IRS, a bill being sent by a supplier. And also, I believe, a few of these messages were actually shown to the jury, were published. They weren't supposed to be. Also, the same as- How did that happen? I forget, Your Honor. It wasn't during on our watch. Your Honor, we didn't do it. But clearly, the jury, and it was undisputed, that these were complaints about- it was complaints about the classmate service. That was the content, the reasons for the calls. So that really doesn't indicate anything about likely of confusion between a sports memorabilia company and a nostalgia content or a social media- because there were two businesses there, social media and nostalgia content. And it was that lack of additional information really was at the heart of Mr. Andrian's testimony. And Mr. Andrian, I might have missed it in the presentation, but no, there was never a request to show Mr. Andrian anything, any of the emails or misdirected communication about his communications, that there wasn't enough evidence. He didn't sit and say, you know, what was in there. He said there wasn't enough evidence. He didn't read them to the jury. Or excuse me, he didn't characterize them. He wasn't allowed to. Right. He said there wasn't enough to show confusion. He did not say they didn't show confusion. He said there wasn't enough information to show confusion. That was the point I wanted to make. Remind me how this whole thing with the misdirected communications came up in terms of exclusion. You moved in Limonide to exclude the emails from being admitted? Yes. Is that right? Yes. And in doing so, your concern was about the negative information that's contained in the email? Well, part of it was, yes. We also believe that because for the reasons I said, there were mistakes, but they didn't show anything about actual confusion. The content was, you know, they were irrelevant. And they didn't show a state of mind of confusion. For somebody, a classmate, to say, I want to cancel, you didn't send me the yearbook, you've overcharged me, shows nothing about state of mind. And confusion is state of mind if you're going to get around a hearsay objection. And it showed nothing about state of mind. So they were excluded. Well, because the thing about it is both experts had reviewed it and talked about them, so it would seem easier for at least some of these emails to be shown to the jury. Well, they were told, they were pretty detailed what they said, just the types of things I'm saying now about bills not being paid, yearbooks, things like that. You might correct that your biggest concern, the reason why you want to keep these out, is because there's a lot of negativity about your client in them. Is that correct? Well, that was part of the motion. That's the reason why you wanted to keep most of them out. Well, we also thought that the ‑‑ we tried to keep out all of the evidence. And the judge in our book actually gave them a benefit by saying, no, you can talk about the number and the general nature. We thought the whole thing would have been misleading. Okay. But there was a lot of negativity in these emails, correct? Yes, there was. Was there ever, ever in this case a theory propounded by the plaintiffs of tarnishment? Yes. Indirectly. I mean, let me give you what happened at the trial. Can I look for that word all over the brief? Pardon? The word's name used in the briefing. Well, I don't know that tarnishment's used in the brief. But at the trial, they paraded through, with Mr. Cohen, Google stories, stories that are on Google about things that, you know, had happened that were negative about classmates, fines, things like that. And they kept asking him, now, weren't you concerned about that? Weren't you concerned about that? Weren't you concerned about that? And that was part of the basis in addition to the things we mentioned in the brief for opening the door by his testimony in the opening argument, that they really brought up the idea of damage to reputation, which justified the cross of Mr. Cohen. My question is, was there ever a tarnishment theory of damages presented in this case? No, not that. No. I'm sorry, I misunderstood. It didn't start when it was filed until the jury came in. That was not a part of this. No, you are. All right. No. And if I can go to, but that leads us to what the theories were for damages. And the courts refused on the attorney's fees. Right. That's your cross appeal. So why don't you address, make sure you address that. Yes, I want to do that from home. One, we think that some of the things I went through already about their admissions, their witnesses, that there wasn't any basis for confusion, the delusion that was, you know, the Manhattan Beach prior user, the lack of actual confusion, and their belief that the similarity of marks even for the same products showed, we don't think it was reasonable. But even more so, when they asked for relief, first, for discouragement, we had two, the client had two businesses that had social media, had nostalgic content. They never presented what the revenues separately were for either one. They did a lump sum. And so we don't think that that solved, you know, they didn't meet their requirement, and they knew that there was a history, that lump sum, that most of the $109 million they put in for the lump sum was money that had been made by classmates alone long before memory lane was ever used for years and years and years. So there was no way that that was attributable to the use. That wasn't a reasonable way to present it, and or through their expert. Licensing, no facts about comparable products being licensed,  instead what online had done when they acquired the mark FTD for florist services, and then a vague average for unnamed marks that weren't comparable, and then they applied it all to the 109. Again, that wasn't reasonable, I mean, at all. It just doesn't meet any legal requirements. For corrective advertising, they didn't put in any damage of harm. They didn't put in any expenditures. They just had their experts say, well, here's how much both parties have spent on advertising. That doesn't have any prima facie showing of a justification for corrective advertising. And I believe I'll save the rest of my time. Well, you should use all your time. Okay. All right. I'm not saving more. Okay. I mean, make sure you cover what you want to cover. Yeah. All right. Well, then I'd like to go back. You know, the one thing we've got here is, and we think that, and I actually should, the court should have, we believe that the court applied the Ninth Circuit test for exceptional case, which we believe this still meets, is the reasonable, whether it's unreasonable, what was done. We think the liability, we think that the different remedy requests that I just described were also unreasonable based on the facts in the case and what they put in. The octane fitness, we believe, which I don't believe this court's ruled on yet, I think it has to be read as necessarily loosening even the Ninth Circuit standard. It's hard to articulate. They're pretty similar. I agree with you. I was just going to say it's hard to articulate the difference, I believe. But to not say that there's any difference in light of what octane fitness, you know, what it was ruling on, what it was ruling on, the decisions about the patent cases and referring to the Lanham Act, I think we've gone away from, you don't have to be unreasonable anymore to be exceptional. They use the phrase stand out, I believe, from other cases. I believe there's the Axel case, Supreme Court, talks about what doesn't mean that it has to be, you know, very infrequent. I think after octane fitness, I think the court should be applying standards, should be looking at it to see is this a very weak case or is that a very weak claim when half of your case is about, you know, your remedies and your relief. Is what you've presented so weak that, you know, it's really different than what we normally see. What's our standard? Abuse of discretion? No, because we don't believe that the court applied octane fitness and we think they should have. So we think it's... Well, the judge has indicated there's not much difference. Well, but there is a difference, I believe. And if there's a difference, then I think it's de novo. You had an issue about cost. Did you want to say anything about the cost? I think, yes, Your Honor. The last thing about cost is it seems like things that we were denied costs and the idea that, well, it was just the last step in the copying when the TIFs were made to go to the plaintiff, that those were the only costs we were sort of entitled to for copying. And whereas, you know, the way it works is, of course, it's in a file someplace and you get a copy, you pull out a copy to work on. Our claim isn't for any review of that in between, but that's a separate cost. And then the cost of creating the TIFs for the production, put it on the CD and forward it, that's the second part. We got that. We didn't get the first part. And I think that the analogy to walking over to a copy machine isn't applicable. That's a one-step process. I've got it. I put it down. I got a copy. Here, I got pulled. I got my copy. I take the copy. I turn it into TIFs so that I can produce it. It's that first step that we think that we should have gotten also. Okay. Thank you. Thank you. You had some time for rebuttal. Thank you, Judge Pius. I want to start with an ancient Chinese proverb. The faintest ink is more powerful than the strongest memory. That proverb goes throughout our rules of evidence, and that's why we're allowed to show juries documents, not just testify about them, testify about what they generally say, but allow the jury to see exactly what was going on here. There was no reason for the jury not to see the misdirected communications. If there was any threat of prejudice, it was equaled by the probative value, and this court should not say in the first instance that there's a Rule 403 problem when the district judge never did. As counsel just noted, though, that was part of their concern in their request for an in limine ruling. No doubt. No? Yes. It was, wasn't it? Yes. But the district judge ruled clearly on two grounds, relevance and hearsay. No Rule 403. Once you said it was irrelevant, then I'm sorry. There's a balancing involved. Was there an offer on your part in response to their motion limiting their express concern about the relevancy of the negative information to redact certain portions of the email? I don't recall if we made that offer, but this actually dovetails into Judge Murphy's question, which was there was always a threat of tarnishing to our reputation. The reason why it wasn't a centerpiece of trial and the reason why it wasn't part of our brief to this court is because in limine we were excluded from presenting any harm to our reputation. Well, tarnishment is a damage theory. It's not a confusion theory. And it was not in this case from the get-go. No, I disagree fully, Your Honor. Can you tell me where, I mean, it's a term of art, and the word doesn't show up anywhere in the excerpts of record, in the briefing, anything. So how can this be a tarnishment case? Well, I disagree, Your Honor. Unfortunately, we're not supposed to present briefs in our excerpts of record, but I would encourage the court to go back and look at our briefing on the in limine motion where the district court did not allow us to present any reputational harm evidence because it has been part of this case. It should have been part of this case. The reason why it wasn't part of the trial was because we were precluded in limine categorically. I'd also wanted, we haven't touched on it, but I did want the court to focus on the cross-examination of my client's founder. Questions like, in fact, no kids got taken to any amusement parks with the money that was given pursuant to your told marketing scripts. Isn't that correct? Did you ever gamble $50,000 on PyGow? The 5% to 15% went to charities. The others went to lifestyles. Ferraris, gambling, and the like, correct? This was a trademark infringement case between two businesses. These questions had no place at this trial, and there's a reason why the federal rules of evidence so strictly constrain. Did you object to all these questions? We objected. The series of events was... My question was, did you object to all these questions? Two, we did. I'm not sure... So, in other words, you didn't object to all these questions. Well, when you say all these questions... I mean, every time that an improper question, in your view, was asked, did you say, Your Honor, I object? We did at the first question that we believed crossed the line. We had moved in limine to limit that evidence. When they crossed the line, we said objection. Rule 403, relevance. Apparently they did ask some questions along this line that you didn't think were over the line. That's correct. I think under the rules and under this court's case law, when there's a prior conviction that relates to fraud, they're allowed to ask about or they're allowed to raise the fact of the conviction, the length of the sentence, and maybe there's one other, maybe the general nature of the crime. But the law is clear that they cannot go behind those crimes and talk about salacious details. And when they did, we said objection, relevance 403. The district court said categorically, you open the door. She eventually sustained the objections. She eventually did, but as this court has held, sometimes questions themselves can be so salacious, so irrelevant, that they taint the entire proceeding. And when we're talking about $50,000 Pygow games in a trademark infringement trial, I can't think of a more distracting, more irrelevant, more prejudicial gambit than that. How do you deal with the proposition that you open the door in the sense when you put on the testimony on direct that you minimized his involvement, suggested that it was a 14-year-old misled by his stepfather? That was the, frankly, Your Honor, we far from minimized it. We told the jury that it was bad, that he shouldn't have done it. We were not trying to minimize the crime. Those two points were the closest that came to minimizing the crime. And you'd have to make an inference from it, but let's assume that you make that inference. Then, under the case law, when you open up that door, they have the right to respond to those points, that it didn't matter that he was young, that he wasn't really affected by this gentleman. That doesn't allow a free-for-all, allowing an inquiry into all kinds of accusations, many of which, frankly, didn't have any foundation whatsoever. The district court should have shut this down as soon as it started, and we know why opposing counsel was doing this. He said in closing argument that you shouldn't award money to somebody like Mr. Cohen. Do you want to address the attorney's fees issue? Even though you're over your time, I'll allow you to address the attorney's fees issue. I appreciate that. Just a moment. There are few issues where there's less, where there's more deference that this court gives to a district court than reviewing the denial of an attorney's fees motion. If you go into this court's case law, generally where there's a reversal of a denial of fees under the Lanham Act, it's where the district court didn't explain its reasoning, just categorically said fees denied. Here we have 16 pages of careful reasoning. The other side said octane fitness was not addressed. In fact, it was addressed. It's cited in the court's order, and in the conclusion the district court says, I quote, Under the totality of the circumstances, neither plaintiff's theory of liability nor its claims for relief stand out for their lack of merit. That quote is directly from octane fitness. The district court was aware of it. The standard meshes with our Lanham Act standard, and for that reason there was no abuse of discretion. Thank you, counsel. The matter is submitted at this time. We appreciate your arguments and interesting case.
judges: Murphy, Paez, Nguyen